Nicole **VOLLENDORFF, a minor child and her parents Michael and Heidi Vollendorff, a married couple, and Gordon Godfrey, guardian ad litem for Nicole Vollendorff, Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

No. 91–35435.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 1991.

Decided Dec. 9, 1991.

William G. Cole, U.S. Dept. of Justice, Wash., D.C., for defendant-appellant.

John A. Hoglund, John A. Hoglund, P.S., Olympia, Wash., Charles K. Wiggins, Edwards, Sieh, Wiggins & Hathaway, Seattle, Wash., for plaintiffs-appellees.

Before WRIGHT, FARRIS and TROTT, Circuit Judges.

FARRIS, Circuit Judge:

The United States appeals the district court's judgment, following a bench trial, in favor of Nicole Vollendorff, her parents Michael and Heidi Vollendorff, and Gordon Godfrey, Nicole's guardian ad litem, on their claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* We affirm.

## I

On August 6, 1987, when Nicole Vollendorff was 19 months old, she ingested Chloroquine, a malarial prophylactic prescription medicine.

Chloroquine is especially toxic to young children. The *Physicians' Desk Reference* advises that a number of fatalities have been reported following accidental ingestion of Chloroquine. *See Physicians' Desk Reference* 2320 (45th ed. 1991).

Chloroquine had been prescribed by an Army physician at Madigan Army Medical Center for Nicole's grandfather, Chief Warrant Officer Gary Vollendorff, an Army helicopter pilot, in connection with Gary's recent tour of duty in Honduras. Because Honduras is an endemic malarial area, the Army requires its personnel serving there to take Chloroquine, both for personal benefit and because of readiness concerns.

To be effective, Chloroquine must be taken once a week for a period of six weeks after departure from the malarial area. Gary had a bottle of the medicine on the kitchen counter of his home near Fort Lewis, Washington on or around August 2, 1987, before leaving with his wife for a one-week vacation. Because Gary disliked child-proof medicine bottles, he stored the Chloroquine without securing the bottle top.

Twice in the period before his departure on vacation, Nicole had gained access to Gary's pills when she was placed on the kitchen countertop by Gary or his wife. Both times, the pills were taken from Nicole, and she was removed from the countertop by either Gary or his wife. In spite of his knowledge that Nicole had been attracted in the past to his pills, Gary continued to store his medication on the counter-

top without securing the child-proof bottle top.

During Gary's absence, his son Michael, daughter-in-law Heidi, and their daughter Nicole, house sat for Gary and his wife. On August 6, 1987, Heidi placed Nicole on the countertop while she washed dishes. While working at the sink, Heidi heard pills spilling and looked to see Nicole with an open pill bottle in her hand. Heidi saw that Nicole had something in her mouth, opened the child's mouth, and removed part of a pill. She took the bottle from Nicole's hand and removed the child from the countertop, believing that she had averted an accident. Ten minutes later, Nicole began to show signs of distress, prompting Heidi to call the local hospital, which connected her with poison control. While Heidi was on the line with poison control, Nicole's condition deteriorated. Heidi was then transferred to 911. Emergency crews arrived soon after to find Nicole unconscious. Their resuscitation efforts continued for about an hour. Nicole was then taken to the hospital.

At the hospital it was determined that Nicole had ingested Chloroquine. Permanent brain damage resulted causing substantial cognitive and communicative impairment. In 1989, Nicole's guardians ad litem and her parents initiated this diversity action against various defendants. Several orders by the district court left the government as the sole defendant at trial.

Following a bench trial, the district court held that the prescribing Army physician and the dispensing Army pharmacist breached a duty to warn and thereby proximately caused Nicole's injury. The district court alternatively held that the Army was vicariously liable for Gary's negligent handling of his medication.

## II

If, as the record reflects, Gary left the medication on the counter with the child-proof top ajar, under the circumstances as he knew them to be, the court could find that he was negligent. The question is whether there is a basis to hold the government vicariously liable for that negligence.

We review a district court's finding of negligence under the clearly erroneous standard. *Barnett v. Sea Land Service, Inc.*, 875 F.2d 741, 745 (9th Cir.1989). This is an exception to the general rule that mixed questions of law and fact are reviewed *de novo*. *Id.* A finding of negligence requires testing particular facts against a standard of conduct. *Armstrong v. U.S.*, 756 F.2d 1407, 1409 (9th Cir.1985). The existence and extent of the standard of conduct are questions of law, reviewable *de novo*, but issues of breach and proximate cause are questions of fact, reviewable for clear error. *Id.*

The district court held that the government was responsible for Gary's negligence on a *respondeat superior* analysis. The government argues (a) that Gary did not commit a tort, and (b) that Gary was not acting within the scope of his employment.

## A

■ Although the district court did not explicitly ground its finding of Gary's negligence on a particular theory, the government relies on the law of premises liability.

Citing *Lucas v. Barner*, 56 Wash.2d 136, 351 P.2d 492, 493 (1960), and *Porter v. Ferguson*, 53 Wash.2d 693, 336 P.2d 133, 134 (1959), the government contends that Gary's duty to Nicole, as a licensee on his premises, was to refrain from wantonly or willfully injuring her. To buttress its contention, the government notes that *Younce v. Ferguson*, 106 Wash.2d 658, 666, 724 P.2d 991, 995 (1986), held that Washington continues to recognize the common law distinction between invitees and licensees. The government's argument overlooks *Memel v. Reimer*, 85 Wash.2d 685, 538 P.2d 517 (1975), which replaced the willful and wanton conduct standard toward licensees with a duty to exercise reasonable care where there is a known dangerous condition that the owner can reasonably anticipate the licensee will not discover or will fail to appreciate. *Id.* at 688–89, 538 P.2d at 519 (citing Restatement (Second) of Torts § 342 (1965)). *See also Younce*, 106

Wash.2d at 667–68, 724 P.2d at 996 (citing *Memel*, 85 Wash.2d at 689, 691, 538 P.2d 517).

The government argues, in any event, that Gary satisfied his duty of care to Nicole, a licensee, by warning Michael about the drugs. The answers of Gary and his wife on direct and cross-examination, however, suggest that no warnings were given. Therefore, the district court's failure so to find was not clearly erroneous.

The court found that Gary knew that he was leaving a prescription drug in a place accessible to a young child and failed to make the condition safe by storing the medicine in a place inaccessible to the child. The record supports those findings. Thus, the district court's determination that Gary was negligent toward Nicole is not clearly erroneous. Had the district court explicitly found Gary negligent on a theory of premises liability, it would necessarily have found either that no warning was given or that the warning given to Michael was not sufficient to discharge the duty of reasonable care. The record supports such findings. The district court's finding of negligence is therefore not clearly erroneous.

### B

■ The government contends that, as a matter of law, Gary's conduct was not within the scope of his employment with the Army because (a) his use of Chloroquine was for his personal benefit, and (b) his storage of the drug was not sufficiently related to his employment. This argument is pivotal where the injury is to a third party *and* the use of the injuring agent is for the benefit of the user.

*Greene v. St. Paul-Mercury Indemnity Co.*, 51 Wash.2d 569, 320 P.2d 311 (1958), articulates the standard in Washington for determining whether an employee, at a given time, acts within the scope of employment:

> The test is ... whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, *or* by specific direction of his employer; *or,* as sometimes stated, *whether he was engaged at the time in the furtherance of the employer's interest.*

*Id.* at 573, 320 P.2d at 314 (citations omitted) (emphasis in original).

The district court correctly found that Gary was under orders to take Chloroquine. The government admitted at the discovery stage that Gary was within a class of soldiers required by Army regulation and policy to take Chloroquine. Additionally, Army Regulation 40–5 provides that commanders will direct disease control measures and ensure compliance, and that personnel will comply with such measures. Army Reg. 40–5, Ch. 4, § 1, at 4–3 (1986).

The government argues that we must find as a matter of law that, because Gary took Chloroquine chiefly to avoid malaria, using Chloroquine was not within the scope of his employment, but was for his personal benefit. We reject the argument.

■ Under Washington law, if the purpose of serving the employer's business "actuates the servant to any appreciable extent," the employer is vicariously liable for conduct of the employee within the agency, even if the predominant motive of the employee is to benefit himself or a third party. *Leuthold v. Goodman*, 22 Wash.2d 583, 157 P.2d 326, 330 (1945) (citing Restatement of Agency § 236 cmt. b (1933)).

In *Leuthold*, an employee had used his employer's truck to dump rubbish from the employer's store and was returning home, as authorized by his employer, to do maintenance work on the truck. *Id.* at 585–86, 157 P.2d at 328. On the way home, he made a deviation of about six blocks in order to pick up family members. *Id.* at 586, 157 P.2d at 328. During that detour, the employee was involved in a mishap. *Id.* at 587, 157 P.2d at 328. The court held that, in spite of the fact that the employee's primary motive for detouring was personal benefit, the evidence sustained a jury finding that the employer was vicariously liable. *Id.* at 594, 157 P.2d at 332.

Gary was ordered to take Chloroquine. His use of the drug was in furtherance of the Army's interest insofar as malarial prophylaxis serves Army concerns for readiness. *Cf. Greene,* 320 P.2d at 314. The district court could properly hold, as a mat-

ter of Washington law, that Gary's use of Chloroquine was within the scope of his employment.

██ The government also argues that Gary's *storage* of Chloroquine was dictated by personal convenience, not governmental interest, and therefore his conduct in that regard was not within the scope of his employment. To address this argument, we turn again to Washington law.

In *Cameron v. Downs*, 32 Wash.App. 875, 650 P.2d 260 (1982), the court held: "[t]o be within the scope of one's agency, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* at 881, 650 P.2d at 263 (citing Restatement (Second) of Agency § 229(1) (1958)). The *Cameron* court concluded that relevant factors are the time, place and purpose of the act, and whether or not the employer had reason to expect that such an act would be done. *Id.*

██ Gary's use of Chloroquine was authorized by the Army, and his storage of the drug was incidental to that authorization. The critical question is whether the Army should have expected that Gary would ignore the generic warning that was plainly printed on the medication, "KEEP OUT OF REACH OF CHILDREN," *and* that Gary would not secure the child-proof cap. One might assume, with the government, that the answer is no. However, we cannot ignore competent evidence to the contrary which, if believed, supports the trial court's finding. Dr. Neal Benowitz testified that

> people don't ... respond to [a generic warning] as a special warning.... And so it is quite common for people who have medications like that to put it on counters.... People know about it, maybe, but it's never taken seriously because, in fact, in most cases, kids, if they get into it, can take a pill or two and there is no serious harm.... [I]f a child gets into [a bottle of Chloroquine]—and we know it's going to happen because it happens with every other drug—... one or two pills may mean the child's death.

The evidence also included a report, Plaintiff's Exhibit 4, by Colonel Scherz, then Chief of Pediatrics at Madigan Army Hospital, stating that "there was a common disregard in the homes of practicing pediatricians of a basic principle of poison prevention extolled to their patients: 'Keep all medications out of reach of children.'" Dr. Vincent DiMaio, a forensic pathologist who researched armed forces experience with Chloroquine during the Vietnam era, testified that "we know and all physicians know that patients don't always fully appreciate how dangerous certain drugs can be so you have to emphasize the fact to them that [Chloroquine] is a very dangerous drug and that extreme precautions have to be taken."

██ We recognize that expectation is not a part of the traditional respondeat superior discourse. We include a discussion of it here, however, because it is relevant to the characterization of the task an employer sets for an employee. If that task, as understood by the employer, encompasses the potential for the employee's negligence, the employer will be liable when the potential becomes manifest. We find these considerations implicit in the treatise approach to respondeat superior analysis. Section 228 of the Restatement (Second) of Agency (1957) speaks in terms of "authorization." Such a term is given content by reference to expectation.

The government stresses that the basis for much of this evidence predated the advent of child-proof bottles and warning labels. The record supports the government's position, but this goes to the weight and not to the sufficiency of the evidence. We cannot conclude, on this record, that the finding of conduct within the scope of employment is clearly erroneous.

By reference to this evidence, we do not imply that the government must develop new standards and procedures when prescribing Chloroquine because it cannot rely on child-proof bottles and warning labels. The elaboration of such a duty is more properly a matter for Washington courts. We only say that this evidence indicates to us that Gary's conduct at home in leaving Chloroquine accessible was within the au-

thorized scope of his employment with the Army.

Finally, the government argues that Gary's storage of Chloroquine at home, off-base, was not within the authorized limits of time or space. Conduct remote in time and place is merely a "factor" in the scope of employment inquiry. *Cameron*, 32 Wash.App. at 881, 650 P.2d at 263. It does not control. The trial court could properly find that Gary was acting within the scope of his employment in keeping the medication at home.

We need not reach the question of negligence of the treating physician and pharmacist.

AFFIRMED.