ELIZABETH GAFFNEY, Special Adm'x of the Estate of Joseph Edward Gaffney, Plaintiff-Appellant and Cross-Appellee, v. THE CITY OF CHICAGO, Defendant-Appellee and Cross-Appellant (Daniel Crocker, Defendant).

First District (2nd Division)    Nos. 1—96—4448, 1—97—1141 cons.

Opinion filed December 4, 1998.—Rehearing denied January 21, 1999.

Stephen Novack, Karen L. Levine, and Timothy J. Miller, all of Novack & Macey, of Chicago, for appellant.

Brian L. Crowe, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Timothy W. Joranko, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

In April 1991, John Crocker, a minor, shot and killed plaintiff's decedent, Joseph Gaffney (also a minor), at a party. The gun John used belonged to his father, Daniel Crocker, a police officer with the City of Chicago (the City). Gaffney sued Officer Crocker for negligent storage of his weapon and attempted to hold the City liable under a *respondeat superior* theory. The jury returned a verdict finding both defendants liable and assessing damages of $1.575 million. The jury answered a special interrogatory by a verdict of 10-2 (which all parties agreed to accept) that Officer Crocker was acting within the scope of his employment when he stored his weapon.

The circuit court denied Crocker's motions for judgment notwithstanding the verdict (judgment *n.o.v.*) and for a new trial but granted the City's motion for judgment *n.o.v.* on the grounds that Daniel was not acting within the scope of his employment at the time he stored

the gun at his home. The court also conditionally granted the City a judgment *n.o.v.* on immunity grounds but denied its motion for judgment on another special interrogatory and its conditional motion for a new trial. Gaffney appeals the judgment *n.o.v.*, and the City conditionally cross-appeals the denial of its motion for a new trial. For the reasons given below, we reverse and remand.

### PERTINENT SUBSTANTIVE FACTS

A number of facts pertinent to this appeal are not in dispute. On April 12, 1991, Daniel Crocker was employed as a patrolman with the Chicago police department (Department). He was assigned to the Department's court section, where his duties entailed ensuring that officers and other witnesses appeared for scheduled court appearances and approving officers' time slips for such appearances. Crocker was required to carry a gun while at work, and he did carry a .38-caliber revolver. He had purchased the weapon in 1976 with his own money, but the City issued him bullets free of charge.

On April 12, Officer Crocker left work after his shift ended at 3:30 p.m. and returned home. When he arrived at home he unloaded his revolver and placed it and the bullets in an unlocked metal cabinet near the stairway leading to his basement. The revolver was not locked or in any way disabled. Crocker's son, John, took the revolver and bullets from the cabinet at approximately 6 p.m. and brought them to a party. At the party, shortly before 11 p.m., John shot Joseph Gaffney with the weapon. John was adjudicated delinquent for the shooting.[1]

At trial, Gaffney's theory of liability with respect to the City[2] was that as Daniel's employer, the City was liable for his negligence under the doctrine of *respondeat superior*. Accordingly, she introduced evidence to show that Crocker was acting in the scope of his employment when he stored the gun. On this issue her two main witnesses were Dr. James Fyfe and Officer Crocker.

Dr. Fyfe, a professor of criminal justice at Temple University, was

---

[1]As noted, the jury returned a verdict against Crocker. It also answered a special interrogatory in which it specifically found that Crocker was negligent and that his negligence was a proximate cause of Joey's death. Crocker has not appealed, and the City has not raised on appeal any argument that these findings were against the manifest weight of the evidence. Accordingly, we take it as a given that the gun was negligently stored and that this negligence was a proximate cause of Joey's death.

[2]In her complaint Gaffney had attempted to hold the City directly liable on a number of theories in addition to the *respondeat superior* count. However, all other counts were dismissed before trial, and Gaffney does not appeal the dismissal of any of these counts.

allowed to testify as an expert. While the record is not clear,[3] it would appear that Fyfe was permitted to testify as an expert in firearms safety. Fyfe testified that the manner in which Crocker stored his gun and bullets was "part of his duties and responsibilities as a Chicago police officer." He stated that the primary reason he so concluded was that Crocker only had the gun because he was a police officer. Fyfe noted that since 1982, when Chicago enacted a municipal ordinance regulating weapon possession (see Chicago Municipal Code § 8—20—010 (1992)) it was "virtually impossible for anybody else but a police officer in Chicago to carry a gun around the city." He also noted that the Chicago police department disciplined officers for "inattention to duty" for improperly safeguarding firearms; that Chicago Police Superintendent LeRoy Martin had stated in his deposition that properly storing a firearm while off duty was "part of the duty responsibilities of a police officer"; and that a general order of the Chicago police department imposed several requirements on "off duty" officers: they are obliged to respond to emergencies in an appropriate manner; they cannot lend their guns to anyone "except in the most dire kinds of emergency"; and they are restricted as to the kinds of weapons they may carry while off duty. Fyfe stated that the Department "basically requires that some officers store their guns at home because, like Officer Crocker, they have no secure place at work to store them, they've got to take them home."

Finally, Fyfe noted that police departments, including Chicago's, could compensate officers for any injuries they sustained as well as for their time if they were involved in "legitimate police action," even though the action occurred outside of their working hours. He gave the example that an officer who caught a car thief while off duty would be compensated "even though he was technically off duty when it occurred." He admitted that he was not aware of Crocker receiving any compensation for the time he took to store his gun and bullets in the cabinet, and he thought that Crocker would not receive "line of duty" disability payments if he fell down his basement stairs while placing his gun in the cabinet because "it would not be considered something that he did while furthering the interests of the people of Chicago."

On cross-examination Fyfe stated that his opinions were unaf-

---

[3]When counsel for the plaintiff tendered Fyfe as an expert, the court cut counsel off and told counsel to proceed before counsel had stated in what field Fyfe was to be qualified as an expert. Also, plaintiff's initial Rule 220 (134 Ill. 2d R. 220) disclosure of Fyfe does not appear to be contained in the appellate record.

fected by the fact that the gun belonged to Crocker, rather than the City. Further, while he admitted that the Department and the City did not "require" an officer to carry a handgun while off of his duty shift, he stated that the reality of the situation was that many officers, including Crocker, had to carry their handguns home while off duty because they were not provided with a location in which to store the guns at work. He admitted that a police officer who intervened in an emergency while off duty was not required to have a gun, although he noted that an officer's possible actions would be limited if he did not have access to a gun. He stated that calling "911" would not be an acceptable response to an emergency if the officer was in fact armed and could reasonably intervene in a life-threatening situation. Fyfe stated that so far as he was aware Chicago did not have any general order, rule or regulation addressing off-duty weapon storage, but it did train its officers with respect to off-duty storage.

Officer Crocker, who was called as an adverse witness during plaintiff's case in chief, also gave testimony relevant to scope of employment. Officer Crocker testified that he was required to own a gun that conformed to Chicago police department regulations; if he did not have such a gun he would not be allowed to report for work. The gun that was used to kill plaintiff's decedent was the gun that Crocker used while on duty. The Department did not provide him with a locker in which to store his weapon at work; accordingly, he brought his gun and bullets home with him every day.

Officer Crocker stated that he did not lock the cabinet or the gun because his life had been threatened several times and his house had been broken into twice. He also stated that he kept the cabinet and gun unlocked "because I'm a Chicago police officer. If I heard someone screaming, would I have time to get that gun, I don't know. Would I attempt to, hopefully." He finally stated that as a Chicago police officer he was required to respond to emergencies at all times even if not on his duty shift, and that sometimes he might need a gun to respond effectively to an emergency if he had it readily available.

Officer Raymond Risley, chief of the Department's organized crime division, testified for the defense that officers could not be disciplined for failing to follow what they learned in training unless it involved violation of an articulated rule. He stated that the Department had no rules, general orders, or directives requiring officers to lock up their guns while at home, off duty. However, Chief Risley admitted that the Department did discipline officers for the way they handled guns at home, while off duty, under a departmental rule prohibiting "inattention to duty." Risley also admitted that an officer could be disciplined for failure to respond to an emergency, whether he was on or off duty

at the time. Edwin Bishop, a retired deputy superintendent in charge of the bureau of staff services for the Department, testified that police officers were authorized to carry a gun at any time. He stated that when officers encountered emergency situations they were required to take some type of action, but what would be appropriate was decided on a case-by-case basis. He stated that the action could be "as little as calling 911," but admitted that depending on the situation an officer could be disciplined for just calling 911 and doing nothing further. He stated, however, that an officer was not required to have a gun when responding to an emergency. He stated that so far as he was aware, all officers were supposed to have lockers where they could store their weapons, although some chose to take their guns home. He admitted that if an officer did not have a locker, he would be forced to take his gun home.

The jury rendered a verdict in favor of plaintiff against both defendants for $1.575 million. On defendants' posttrial motions the court let stand the jury's verdict against Officer Crocker but granted the City judgment notwithstanding the verdict on the basis that Crocker was not acting within the scope of his employment. The court stated in its order that:

"If Daniel Crocker were, under the facts of this case, acting within the scope of his employment in storing his weapon in his home while off duty and preparing for a weekend of freedom from the job, it is hard to imagine when if ever the home storage of a weapon by a police officer would not be within the scope of employment. Such an interpretation of the 'scope' issue would impose strict liability upon the City of Chicago, under a *respondeat superior* theory, for any harm caused by the unauthorized, negligent use of a weapon stored in the home of an off duty police officer. The court will not impose such liability."

The court conditionally denied the City's request for entry of verdict on a special interrogatory and its motion for a new trial, but stated that if it had "found against the City on the scope of employment claim, it would have granted its JNOV motion on the immunity defenses and here so conditionally rules on that issue."[4]

---

[4]The full text of our disposition contains analysis of three other issues in addition to the *respondeat superior* analysis contained in the published portion of this opinion. First, we determine that we have jurisdiction to consider the appeal and none of the issues have been waived, notwithstanding the parties' arguments concerning the finality of the trial court's order granting the City judgment *n.o.v.* on *respondeat superior* grounds. Second, we hold that the City was not entitled to judgment *n.o.v.* on immunity grounds. Finally, we

ANALYSIS

## I. JURISDICTION

The material in this section is nonpublishable under Supreme Court Rule 23. 166 Ill. 2d R. 23.

## II. SCOPE OF EMPLOYMENT

■ We review orders granting judgment *n.o.v.* under a *de novo* standard (*Williams v. Hall*, 288 Ill. App. 3d 917, 919, 681 N.E.2d 1037, 1038 (1997), citing *Arellano v. SGL Abrasives*, 246 Ill. App. 3d 1002, 617 N.E.2d 130 (1993)), asking the same question the circuit court asks in the first instance in determining whether to grant judgment *n.o.v.* (*Thacker v. UNR Industries*, 151 Ill. 2d 343, 353-54, 603 N.E.2d 449, 454 (1992); *Johnson v. National Super Markets, Inc.*, 257 Ill. App. 3d 1011, 1015, 630 N.E.2d 934, 937 (1994)). Judgment *n.o.v.* should only be granted if all of the evidence, when viewed most favorably to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pasqualè v. Speed Products Engineering*, 166 Ill. 2d 337, 351, 654 N.E.2d 1365, 1374 (1995); *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513 (1967); *Rheinheimer v. Village of Crestwood*, 291 Ill. App. 3d 462, 472, 684 N.E.2d 777, 783 (1997). Judgment *n.o.v.* is improper where reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Pasquale*, 166 Ill. 2d at 351, 654 N.E.2d at 1374. In ruling on such a motion, "a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512 (1992). Accord *Rheinheimer*, 291 Ill. App. 3d at 472, 684 N.E.2d at 784. Judgment *n.o.v.* cannot be entered "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting

---

reject the City's argument that it was entitled to a new trial because the trial court improperly instructed the jury.

However, because of the page limitations imposed under revised Supreme Court Rule 23 (166 Ill. 2d R. 23), we are compelled to delete from the published portion of this opinion our discussion of the above issues, as well as additional facts which relate to the issues of jurisdiction and waiver. These additional matters are included in the unpublished portion of this decision, and a full, unabridged text of this decision is on file with the clerk of this court under Docket No. 1—96—4448.

evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512.[5]

    ■ Thus the question before us is whether there was any evidence creating a substantial factual dispute as to whether Crocker was acting in the scope of his employment when he stored the gun. Plaintiff notes that generally the question whether an act is within the scope of an employee's employment is left to the jury; however, it is clear that this issue may be decided as a matter of law if the answer is sufficiently clear. *Wright v. City of Danville*, 174 Ill. 2d 391, 408, 675 N.E.2d 110, 119 (1996) (affirming circuit court's dismissal of complaint because employees were acting outside the scope of their employment); *Pyne v. Witmer*, 129 Ill. 2d 351, 359, 543 N.E.2d 1304, 1308 (1989); Restatement (Second) of Agency § 228, Comment *d* (1958) (hereinafter Restatement (Second)).

    The term "scope of employment" has been characterized as a "highly indefinite phrase" which "refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." W. Keeton, Prosser & Keeton on Torts § 70, at 502 (5th ed. 1984) (hereinafter Prosser). Illinois adheres to the following three criteria promulgated in the Restatement (Second):

    " '(1) Conduct of a servant is within the scope of employment if, but only if:

        (a) it is of the kind he is employed to perform;

        (b) it occurs substantially within the authorized time and space limits;

        (c) it is actuated, at least in part, by a purpose to serve the master ***

        ***

---

[5]The appellate courts have differed slightly on the application of this rule. Compare *Rheinheimer*, 291 Ill. App. 3d at 472, 684 N.E.2d at 783 (judgment *n.o.v.* is only proper if there is a "total failure or lack of evidence to prove an essential element of the plaintiff's case"), *Cohan v. Garretson*, 282 Ill. App. 3d 248, 257, 667 N.E.2d 1325, 1332 (1996) (same), and *Bryant v. Livigni*, 250 Ill. App. 3d 303, 313, 619 N.E.2d 550, 558 (1993) (same), with *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873, 680 N.E.2d 394, 396 (1996) (judgment *n.o.v.* may be entered "[a]lthough sparse evidence may exist to favor the verdict," so long as the *Pedrick* standard is satisfied). *McCraw* would appear to state the standard more accurately, in light of the reference in *Maple* to a "*substantial* factual dispute." (Emphasis added.) *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512. However, we need not determine this precise question, because in this case judgment *n.o.v.* was improper under either standard.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.' " (Omission in original.)[6] *Pyne,* 129 Ill. 2d at 360, 543 N.E.2d at 1308, quoting Restatement (Second) § 228, at 504.

We find plaintiff put on sufficient evidence on all three factors that judgment *n.o.v.* on the issue was improper.

■ The first factor is that the act of the servant must be "of the kind" the servant was employed to perform. *Pyne,* 129 Ill. 2d at 360, 543 N.E.2d at 1308; Restatement (Second) § 228(1)(a), at 504. This concept is broad enough to include not only conduct that the employer has authorized, but also conduct of the same general nature as that authorized and acts "incidental" to authorized conduct. Restatement (Second) § 229(1), & Comment *a,* at 506. The factors to be considered in determining whether conduct, although not in the category of authorized conduct, is nevertheless within the scope of employment, include whether or not the act is one commonly done by such servants; the time, place and purpose of the act; the previous relations between the master and servant; whether the act is outside the enterprise of the master; whether or not the master has reason to expect that such an act will be done; the similarity of the act done to the act authorized; and whether or not the instrumentality by which the harm is done has been furnished by the master to the servant. *Wilson v. Clark Oil & Refining Corp.,* 134 Ill. App. 3d 1084, 1090, 481 N.E.2d 840, 844 (1985), citing Restatement (Second) § 229(2). All of these factors need not be satisfied for an act to be found incidental to authorized conduct. *Hill v. Mitchell,* 653 F. Supp. 1194, 1197-98 (E.D. Mich. 1986) (holding that foreseeability alone may bring an action within the scope of employment). The Restatement clarifies that for an act to be considered incidental to an authorized act, such that it will be considered of the kind that the employee is employed to perform, the act must be

"subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do. The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive." Restatement (Second) § 229, Comment *b,* at 508.

The Restatement also specifically provides with respect to acts "of a personal nature" that "even such personal matters as eating, and

---

[6]The omitted subsection deals with the intentional use of force by the servant, which is not relevant to this case. See Restatement (Second) § 228(1)(d).

cleaning of the person may be so much a part of the work and under such control that it is part of the employment *** if the master assumes control over the general conduct of the servant during such period." Restatement (Second) § 229, Comment *c*, at 509.

█ In this case Crocker's storage of the gun at home can well be characterized as incidental to the requirement of his employment that he respond to any emergency that occurs in his presence. First, of the factors listed in the Restatement, the only factors which *seem to bear* on the case militate in favor of a finding that in this case Crocker's storage was incidental. Whether or not officers without storage facilities at work "commonly" store their guns at home (and the City would be hard-pressed to say they do not), the Department would clearly have reason to *expect* that they would do so and in fact *does* expect that they will do so, as evidenced by its specific training of officers on how to store weapons safely at home. This alone would support a finding that the act was incidental to an authorized act and therefore an act of the kind Crocker was employed to perform. See *Hill*, 653 F. Supp. at 1197-98. Further, in this case Crocker stored his weapon in his immediate vicinity immediately after arriving home after his shift, and according to his testimony he stored it where he did, in the way he did, in order (in part) to have it available in case of an emergency (as we will discuss more fully below). Although none of the remaining factors appear to militate in plaintiff's favor on this issue, they also do not strongly militate in favor of the City. Further, even if some of those factors would support a finding that Crocker's storage was not incidental to the requirement that he respond to emergencies, the question before us on review of a judgment *n.o.v.* is whether the evidence, when viewed most favorably to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. Judgment *n.o.v.* is improper where reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Pasquale*, 166 Ill. 2d at 351, 654 N.E.2d at 1374. The factors in plaintiff's favor constituted sufficient evidence to preclude judgment *n.o.v.* on the question whether the gun storage was incidental to Crocker's duty to respond appropriately to any emergency occurring in his presence.[7]

This result is also supported by the comments to the Restatement.

---

[7]The uncontroverted facts that (1) officers are not *required* to carry their guns at all times while off duty, and (2) they are not required to have a gun to respond to an emergency, are not dispositive. Although such requirements would make Officer Crocker's storage more obviously within the scope of his employment, it is clear that an employer's vicarious liability is not limited to

Crocker's storage of the gun was pertinent to his response to an emergency (which there is no dispute constituted part of his employment), and storing a gun unlocked was "an act which it is not unlikely that such a servant might do." This supports a finding that the act was incidental to Crocker's employment. See Restatement (Second) § 229, Comment *b*, at 508. Further, although normally at-home storage of one's personal effects would likely be considered an act of a personal nature, the Department not only trained its officers in off-duty weapon storage, both Dr. Fyfe and Chief Risley testified that the Department could and did discipline officers for improper safeguarding of weapons while off duty.[8] Under the Restatement this would provide some additional support for the conclusion that the storage was incidental to Crocker's employment. See Restatement (Second) § 229, Comment *c*, at 509 ("even such personal matters as eating and cleaning of the person may be so much a part of the work and under such control that it is part of the employment *** if the master assumes control over the general conduct of the servant during such period").

■ The next question is whether the conduct occurred "substantially within the authorized time and space limits" of the employment. *Pyne*, 129 Ill. 2d at 360, 543 N.E.2d at 1308; Restatement (Second) § 228(1)(b), at 504. We note initially that although relevant to scope of employment analysis, the fact that conduct occurred outside the time and space limits is not dispositive. See *Vollendorff v. United States*, 951 F.2d 215, 220 (9th Cir. 1991) ("'[c]onduct remote in time and place is merely a 'factor' in the scope of employment inquiry. [Citation.] It does not control"); *Bauer v. City of Chicago*, 137 Ill. App. 3d 228, 232, 484 N.E.2d 422, 425 (1985) ("it is beyond dispute that the city can be held liable for the actions of an off-duty police officer") (and cases cited therein). See also *Avtec Systems, Inc. v. Peiffer*, 21 F.3d 568, 571-72 (4th Cir. 1994) (when acts are of the kind the servant is employed to perform and are at least appreciably motivated by a desire to serve the employer, courts tend not to find conduct outside the scope of employment "solely on the basis that the work was done at home on off-hours"); *Miller v. CP Chemicals*, 808 F. Supp 1238, 1242-44 (D.S.C. 1992) (granting summary judgment that work was within scope of employment because it was incidental to the employee's

those actions which it specifically commands its employees to perform. Rather, it extends to acts incidental to the requirements of the employment. Restatement (Second) § 229(1) & Comment *a*, at 506.

[8]The City admits in its brief to this court that the fact that the City disciplines officers for failing to safeguard their weapons was established at trial and was never contested at trial by the City.

other work and was done for the primary benefit of the employer, notwithstanding that the work was done at home, after hours, and the employee, who was paid by the hour, was not compensated for it).[9]

Also, it is not clear that Officer Crocker's at-home weapon storage could not be considered within the time and space limits of his employment. As the City observes, when Crocker stored his weapon he was off duty and at home—"the normal antithesis of being 'at work.' " However, the City concedes that officers are in at least some sense "on duty" 24 hours a day, in that they are required to respond to emergencies that occur in their presence. It is true that this fact alone does not "make every action of a policeman, no matter how felonious or depraved, a 'performance of his duties as policeman.' " *Karas v. Snell*, 11 Ill. 2d 233, 252, 142 N.E.2d 46, 56-57 (1957). However, the Restatement provides:

> "Although the servant has regular hours of employment, he may be upon call at other hours, or, having the custody of land or chattels, he may have continuing duties of care in connection therewith. If so, and if he performs his duties negligently, the employer is responsible." Restatement (Second) § 233, Comment *c*, at 517.

According to Crocker's testimony in this case (as will, again, be discussed below), his negligent manner of gun storage was motivated in part by his desire to have the gun accessible in the event of an emergency. With respect to emergencies, Crocker was "on call" 24 hours a day. It is not unreasonable to conclude that the time and space of Crocker's employment are unlimited with respect to actions *incidental* to his response to an emergency just as they are with respect to the requirement of his employment that he respond to an emergency.

Prior to his appointment to the United States Supreme Court, Justice David Souter wrote that when an employee has the obligation or even the option to "perform official duties whenever the need may arise" and the employee "acts to perform a normally authorized task

---

[9]*Avtec Systems* and *Miller* concerned actions between employers and employees regarding ownership of the copyrights on computer programs the employees developed. Analysis of this question required a determination whether the employee's creation of the material was within the scope of his employment. Whereas a copyright generally belongs to the author (17 U.S.C. § 201(a) (1994)), the entity for whom the work is prepared owns the copyright if it is a "work made for hire" (17 U.S.C. § 201(b) (1994)). In the case of an employee (as opposed to an independent contractor), a work made for hire is "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1) (1994). Both *Avtec Systems* and *Miller* looked to section 228 *et seq.* of the Restatement to make the determination.

during an off duty period, his activity is within the scope of employment and his employer may be held liable for his tortious performance." *Daigle v. City of Portsmouth*, 129 N.H. 561, 579, 534 A.2d 689, 699 (1987). *Daigle* refused to overturn a jury's verdict that a city was liable *respondeat superior* for a police officer's battery of a suspect in public, more than two hours after the officer's duty shift ended, stating that "[t]he city had no right to any ruling that [the officer] must perforce have acted outside the temporal scope of his employment, and any such conclusion, indeed, would have been error." *Daigle*, 129 N.H. at 580, 534 A.2d at 699. See also *Frazier v. State*, 64 N.Y.2d 802, 803, 476 N.E.2d 318, 319, 486 N.Y.S.2d 919, 920 (1985) (question of fact precluded summary judgment in favor of state on *respondeat superior* claim for injury police officer inflicted on bystander while making off-duty arrest). *Daigle* and *Frazier* are distinguishable from the instant case in that there is no evidence that Crocker was responding to an actual emergency. However, even acts incidental to authorized conduct may give rise to *respondeat superior* liability (Restatement (Second) § 229(1) & Comment *a*, at 506), and in this case Crocker was storing his gun at a time and a place where he could have had to respond to an emergency.

■ The final Restatement factor is that the employee's conduct must be motivated, at least in part, by a desire to serve the employer. *Pyne*, 129 Ill. 2d at 360, 543 N.E.2d at 1308; Restatement (Second) § 228(1)(c), at 504. Fyfe, plaintiff's expert, testified that having a gun available would increase the options available to an officer in the event of an emergency. Officer Crocker testified similarly that he might need a gun to respond to an emergency effectively, and none of the City's witnesses disagreed that having a gun would increase the options available to the officer. Crocker explicitly testified that one of the reasons he kept the gun and cabinet unlocked was "because I'm a Chicago police officer. If I heard someone screaming, would I have time to get that gun, I don't know. Would I attempt to, hopefully." From this latter testimony can clearly be inferred that one of the reasons Crocker kept the gun and cabinet unlocked was *because* he might need it in the event of an emergency. It is true that Officer Crocker testified that he also kept the unlocked gun in the unlocked cabinet in order to protect his family. However, this factor in *respondeat superior* analysis is satisfied so long as the employee is motivated in part by a desire to serve the employer, even if the employee is also motivated by personal considerations. *Sunseri v. Puccia*, 97 Ill. App. 3d 488, 493, 422 N.E.2d 925, 930 (1981); Restatement (Second) § 236, at 523-24. Crocker's testimony supports findings that his storage of his gun at home, and indeed the specific negligent manner in which he

chose to store it, was actuated, at least in part, by his desire to have the gun available should an emergency arise.

We note that the fact that Crocker stored the gun in contravention of the Department's recommendations is not determinative that the storage was not within the scope of employment. The Restatement specifically provides that "[a]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Restatement (Second) § 230, at 511. See also Restatement (Second) § 230, Comment *b*, at 511 ("[a] master cannot direct a servant to accomplish a result and anticipate that he will always use the means which he directs or will refrain from acts which it is natural to expect that servants may do"); Restatement (Second) § 230, Comment *b*, Illustration 1, at 511 ("P directs his salesman, in selling guns, never to insert a cartridge while exhibiting a gun. A, a salesman, does so. This act is within the scope of employment"). See also *Martin v. Central Ohio Transit Authority*, 70 Ohio App. 3d 83, 92-93, 590 N.E.2d 411, 417 ("[t]hat an employee was acting in violation of some instruction or rule of an employer is generally held to be of no consequence" in determining whether conduct is within the scope of employment); Prosser § 70, at 502, stating:

> "The fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited, is to be considered in determining what the servant has been hired to do, but it is usually not conclusive, and does not in itself prevent the act from being within the scope of employment."

Indeed, rather than militating *against* a finding that an act was within the scope of employment, *Martin* held that an employer's rule prohibiting certain actions "only reinforces the conclusion that [such] actions were expected and foreseeable." *Martin*, 70 Ohio App. 3d at 94, 590 N.E.2d at 419 (transit authority's letter prohibiting bus drivers from possessing weapons on buses).

The above analysis from first principles is supported by the weight of authority. Illinois courts have found a triable issue of fact as to whether a city that employed a police officer should be held liable *respondeat superior* when the officer's minor child obtained possession of a gun the officer had brought home and shot another child. *Dragovan v. City of Crest Hill*, 115 Ill. App. 3d 999, 451 N.E.2d 22 (1983). In *Dragovan* the officer brought the gun home in violation of both a court order and departmental procedures, but the court found

there was a triable issue of fact whether the officer's actions were within the scope of his employment.[10]

In *Jacks v. Woodruff*, 9 Ill. App. 2d 224, 132 N.E.2d 603 (1956), a jury found an employee to have been acting within the scope of his employment; the trial court entered judgment *n.o.v.* on that issue in favor of the employer; and the appellate court reversed and remanded with directions to reinstate the jury verdict. In *Jacks* the employee was sued for striking a pedestrian with his car while driving home after work. The appellate court based its result on evidence that at the time of the occurrence the employee was transporting his own ladders home from the location at which he had been working and he intended to transport the ladders to a different work location (still working for the same employer) the next morning "so that they would be available *if needed.*" (Emphasis added.) *Jacks*, 9 Ill. App. 2d at 232, 132 N.E.2d at 606-07. Analogously, in this case, Officer Crocker brought his gun home and stored it negligently so that it would be available if needed to respond to an emergency. Indeed, in this case the link is stronger than in *Jacks*, in that Crocker testified that he was motivated to store the gun in the specific negligent manner in which he did in order to have it available, whereas in *Jacks* there is no indication that the accident was in any way caused by or related to the ladders.

Finally, in *Vollendorff*, the Ninth Circuit Court of Appeals affirmed the district court's judgment that an employer was liable *respondeat superior* for its employee's negligent storage of medicine at home. In that case the employee's minor grandchild was severely injured when she obtained access to the employee's medicine and swallowed some of it. The appellate court rejected challenges that *respondeat superior* liability should not be imposed because the employee's use of the medicine was for his personal benefit and because his storage was not sufficiently related to his employment. The court found that the employee's use of the medicine was authorized by his employer (the United States Army) and "his storage of the drug was incidental to that authorization." *Vollendorff*, 951 F.2d at 219. The court found the critical question to be whether the Army should have expected that the employee would negligently store the medicine as he did, stating that the term "authorization," as used in section 228 of the Restate-

---

[10]It is not entirely clear how analogous *Dragovan* is to the instant case, however, because that court did not state for what action or on what theory the officer was being sued, *e.g.*, whether plaintiff's cause of action was based on the officer's having the gun in his house at all or on the officer's negligently leaving the gun on a sofa where his son could reach it while he (the officer) ate lunch in another room.   ·

ment, was "given content by reference to expectation." *Vollendorff*, 951 F.2d at 219. It found that "expectation" was "relevant to the characterization of the task an employer sets for an employee. If that task, as understood by the employer, encompasses the potential for the employee's negligence, the employer will be liable when the potential becomes manifest." *Vollendorff*, 951 F.2d at 219.

The City relies heavily on a statement in *Wolf v. Liberis*, 153 Ill. App. 3d 488, 492, 505 N.E.2d 1202, 1206 (1987), that a municipality is liable only for those acts of an off-duty policeman that fall within the scope of his employment, specifically those acts he performs to enforce the law and preserve the peace. We find the second half of this statement is overly restrictive because, as noted above, an employer may be held liable for an employee's acts that are ancillary or incidental to his work. Further, the statement is *dictum* because the *Wolf* court found the officer to have been acting outside the scope of his employment because his conduct "was sufficiently reckless and irresponsible to be an unacceptable departure from the scope of his duties as a Chicago police officer." *Wolf*, 153 Ill. App. 3d at 495, 505 N.E.2d at 1207-08.

Authority the City cites from other jurisdictions is distinguishable on the basis that there was no evidence that the employees were in any way motivated by a desire to serve their employers' interests at the time of their negligence. See *Joseph v. City of Buffalo*, 83 N.Y.2d 141, 629 N.E.2d 1354, 608 N.Y.S.2d 396 (1994) (police officer left loaded, unlocked revolver beneath his three-year-old child's mattress while he "reclined" downstairs); *Maginniss v. City of New York*, 216 A.D.2d 134, 629 N.Y.S.2d 200 (1995) (officer left loaded gun on coffee table near his friends (who had been drinking) while he went to take a shower); *Valence v. State*, 280 So. 2d 651 (La. App. 1973) (officer only had the gun that caused the injury because of threats made against him; officer left the gun loaded in the unlocked glove compartment of his car while his wife took the car to a neighbor's house without him).

Crocker's testimony could be attacked on the basis that he slept on the second floor of his home, whereas the locker in which he kept the gun was on the first floor. Also, Crocker's assertion is inconsistent with that of his own expert, Fyfe, who testified that Crocker's act of storing his gun "would not be considered something that he did while furthering the interests of the people of Chicago." Finally, Officer Crocker's testimony is also inherently subject to question because of its self-serving nature—the City would have to indemnify him for any judgment against him if he stored the gun while he was "engaged in the performance of his or her duties as a police officer," so long as he was not engaged in willful misconduct. 65 ILCS 5/1—4—5 (West 1992).

However, these are merely factors to be considered in evaluating

the weight to be accorded Crocker's testimony. They are not a proper basis for upholding a judgment *n.o.v.* since, as previously discussed, in granting a judgment *n.o.v.* the court may not weigh evidence or assess credibility. As previously noted, judgment *n.o.v.* is improper where reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Pasquale*, 166 Ill. 2d at 351, 654 N.E.2d at 1374. All evidence is viewed most favorably to the nonmovant, and the court must neither weigh evidence nor assess credibility. *Maple*, 151 Ill. 2d at 453, 603 N.E.2d at 512. Taken at face value, Officer Crocker's testimony supports a finding that he was motivated, at least in part, by a desire to serve the City's interests in storing his gun.

III. IMMUNITY

The material in this section is nonpublishable under Supreme Court Rule 23. 166 Ill. 2d R. 23.

IV. NEW TRIAL

A. Jury Instructions

The material in this section is nonpublishable under Supreme Court Rule 23. 166 Ill. 2d R. 23.

B. Manifest Weight of the Evidence

■ Finally, the City contends that it is entitled to a new trial because the jury's verdict was against the manifest weight of the evidence. Initially, we must address plaintiff's contention that the City failed to request a new trial on this basis at trial. It is well settled that after a jury trial a party may not raise on appeal any purported errors except those raised in its posttrial motion. 155 Ill. 2d R. 366(b)(2)(iii); *Thacker*, 151 Ill. 2d at 353, 603 N.E.2d at 454; *Metropolitan Life Insurance Co. v. Nauss*, 226 Ill. App. 3d 1014, 1019, 590 N.E.2d 524, 528 (1992). Accordingly, had the City failed to request a new trial on the basis that the jury's verdict was against the manifest weight of the evidence, it would have waived that point on appeal.

■ However, the City did request a new trial on this basis. In its posttrial motion the City contended that the "manifest weight of the evidence proves that Daniel Crocker was not acting within the scope of his employment with the [Department] when he stored his personally owned revolver at home after work." In the section of its posttrial brief dealing with its motion for a new trial, the City explicitly argued that "[j]ury determinations should be set aside 'when the trial court is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence,' " quoting *Torrez v. Raag*, 43 Ill. App. 3d 779, 782 (1976).

■ The next question is what degree of deference to accord the trial court's conditional ruling denying the City's motion for new trial. Neither party addresses this point. When a trial court is presented with a motion for new trial on the basis of insufficiency of the evidence, it must grant such a motion only if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513; *O'Neil v. Continental Bank, N.A.*, 278 Ill. App. 3d 327, 335, 662 N.E.2d 489, 495 (1996) ("[a] motion for a new trial is directed to the sound discretion of the trial court who [*sic*] must determine whether the verdict is contrary to the manifest weight of the evidence"). Normally a trial court's decision whether to grant a new trial is reviewed only for abuse of discretion. *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513 ("[a] court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion"); *Spurgeon v. Alton Memorial Hospital*, 285 Ill. App. 3d 703, 708, 674 N.E.2d 517 (1996) ("the allowance of a motion for a new trial is within the trial court's discretion, and its decision to grant a new trial will not be disturbed absent a clear abuse of that discretion"); *O'Neil*, 278 Ill. App. 3d at 335, 662 N.E.2d at 495 ("[t]he trial court's decision to deny a new trial will not be disturbed on appeal unless there is a clear abuse of discretion that affirmatively appears from the record"). In determining whether the trial court abused its discretion, the reviewing court is to consider whether the verdict was supported by the evidence and whether the losing party was denied a fair trial, keeping in mind that " ' "[t]he presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' " *Maple*, 151 Ill. 2d at 456, 603 N.E.2d at 513, quoting *Buer v. Hamilton*, 48 Ill. App. 2d 171, 173-74, 199 N.E.2d 256 (1964), quoting *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 47, 142 N.E.2d 717 (1957).

■ However, in the case at bar, the court's comments in its order entering judgment *n.o.v.* in favor of the City on scope of employment appear to indicate that the result it reached was based on a lack of evidence to uphold the jury's conclusion. In that regard the court stated: "[i]f Daniel Crocker were, *under the facts of this case*, acting within the scope of his employment in storing his weapon in his home while off duty and preparing for a weekend of freedom from the job, it is hard to imagine when if ever the home storage of a weapon by a police officer would not be within the scope of employment." (Emphasis added.) Accordingly, the court's conditional denial of a new trial on the basis that the verdict was against the manifest weight of the evidence

was inconsistent with its grant of judgment *n.o.v.*, because the standard for a judgment *n.o.v.* is higher than that for a new trial. See *Maple*, 151 Ill. 2d at 453-54, 603 N.E.2d at 512 (a "more nearly conclusive evidentiary situation" is required for judgment *n.o.v.* than for a new trial). We could find the denial of the motion for a new trial an abuse of discretion on this basis and reverse outright. *Cf. In re Salmonella Litigation*, 248 Ill. App. 3d 513, 515, 618 N.E.2d 473, 475 (1993). However, such an action would be inappropriate in this case because, for the reasons already stated, judgment *n.o.v.* was improper. On the other hand, we cannot state conclusively that the court would have erred if it had found the verdict to be against the manifest weight of the evidence, because of its superior position with respect to determinations of witness credibility. See *Maple*, 151 Ill. 2d at 455-56, 603 N.E.2d at 513. Accordingly, because of the inconsistency between the court's rulings on the motions for judgment *n.o.v.* and for new trial and our reversal of the former ruling, we feel the most appropriate course of action is to exercise our inherent power under Supreme Court Rule 366(a)(5) and remand with directions that the court reconsider the motion for new trial (on the grounds that the verdict is against the manifest weight of the evidence) and issue a ruling thereon which explains its reasoning. A remand on this issue is especially appropriate in light of the questions which we have previously noted concerning Crocker's testimony, *e.g.*, the distance between his bedroom and the gun locker, the self-serving nature of the testimony, and the fact that Dr. Fyfe, plaintiff's own expert, contradicted Crocker.

## CONCLUSION

For the reasons stated above, we dismiss the appeal in cause No. 1—96—4448 for lack of jurisdiction. In cause No. 1—97—1411, we reverse the trial court's entry of judgment notwithstanding the verdict in favor of defendant the City of Chicago and remand for the court to consider the City's motion for a new trial on the grounds that the verdict was against the manifest weight of the evidence, directing the court to explain its reasoning when it rules thereon.

So ordered.

No. 1—96—4488, Dismissed.
No. 1—97—1141, Reversed and remanded.

CAHILL and LEAVITT, JJ., concur.