# Vinitski v. Adler

*Gerald B. Baldino Jr.* and *Francis Curran Jr.,* for plaintiffs.

*Kevin H. Wright* and *Richard R. Galli,* for defendants.

ALLEN, *J.,* September 17, 2004—

## FACTS

Plaintiffs commenced this medical malpractice action in April 2001 alleging, inter alia, that the combination of medication—Tofranil, Xanax, Prozac, Depakote and Valium—prescribed by the defendants and used intermit-

tently by the plaintiff, Simon Vinitski, over a 10-year period caused plaintiff to sustain "serious and painful physical injuries, including brain injury, and permanent damage to his brain and central nervous system . . . ." Complaint, ¶16. See also, complaint, ¶21 ("[p]laintiff . . . has endured physical pain, mental anguish, discomfort, inconvenience and distress, and will continue to endure the same in the future").[1]

A revised case management order, dated June 20, 2002, provided a discovery schedule in anticipation of an August 4, 2003 trial date. Pursuant to that order, plaintiffs were to submit their experts' reports no later than March 3, 2003, and the defendants no later than April 7, 2003.

On October 1, 2002, plaintiffs submitted the expert report of Peter R. Breggin M.D. Defendants' reports were submitted as follows:

Expert report of Jeffrey Janofsky M.D., forwarded to plaintiffs on April 25, 2003;

Expert report of Carl Salzman M.D., forwarded to plaintiffs on April 25, 2003; and

Expert report of Marc W. McKenna M.D., forwarded to plaintiffs on May 8, 2003.

In July 2003, plaintiffs' counsel filed a petition for leave to withdraw. Said petition was granted on August 20, 2003. Plaintiffs, now pro se, having received an expert report from Charles Nemeroff M.D., Ph.D. on August 25, 2003, submitted said report 90 days later on November 25, 2003.

---

1. A menagerie of complaints associated with this type of action, too, is listed. However, further elaboration will do little to assist in the court's analysis.

The Nemeroff report provides the following information:

"The care provided by Dr. Perkel and Dr. Adler for Dr. Vinitski is substandard as regards the community standard of care. There is little documentation or quantification of his psychiatric symptoms. There is absolutely no discussion of a differential diagnosis of either organic causes or a psychiatric differential diagnosis. There was no attempt to obtain a second opinion and the diagnoses change over time from anxiety to bipolar disorder to cyclothymia to agitated depression. Due to the fact that fluoxerine was introduced in 1998, imipramine was a poor choice for this patient to begin with and combination of imipramine and Prozac often raises imipramine plasma levels to a toxic level. In the absence of repeated imipramine therapeutic monitoring, it is impossible to know whether that was ever the case. Whether the anticholinergic effects of imipramine or desipramine worsened his cognitive deficits is also unclear. However, this patient deserved an intensive diagnostic evaluation early in the course of his illness. He should have had all the medical causes for both his psychiatric and neurological symptoms ruled out, for example, hypothyroidism, B-12 deficiency, etc. A second opinion should have been sought by Drs. Perkel and Adler. All of his symptoms initially are referable to what appears to be an organic dementing process. Whether he ever suffered from a mood or anxiety disorder is unclear. Finally, depression is known to be a risk factor for the development of dementia, and inadequate treatment of depression might have hastened the onset of the dementing process.

"In summary, the lack of substantial documentation of the process of differential diagnosis and in the face of

a poor response, the lack of consultation with experts in the area (there are several available in the Philadelphia area) renders [sic] my firm conclusion of the care provided to Dr. Vinitski to be not only suboptimal but below the minimal standards of care that one would expect from practitioners in the field."

When the court granted counsel's petition to withdraw as counsel for plaintiffs, trial was then set to begin January 5, 2004. Neither party requested an extension of deadlines (for submission of expert reports or any other discovery), nor was an extension given by the court. Thereafter on December 8, 2003, a settlement conference was held at which time the court continued the trial date from January 5, 2004 to June 14, 2004. In addition the court informed each party that submission of new or modified expert reports would not be accepted at that time or any time thereafter. On January 2 and 7, 2004, counsel entered their appearances on behalf of plaintiffs. On March 9, 2004, Vinitski was examined by Dr. Breggin.

Despite this court's edict of December 8, 2003, plaintiffs sought the submission of two expert reports and the revision of a previously submitted report. Specifically, in March 2004, plaintiffs provided the defendants with the expert report of Robert P. Wolf Ed.D., M.B.A. dated February 11, 2004. Defendants then filed a motion to strike; said motion was granted on May 24, 2004. On April 6, 2004, plaintiffs provided the curriculum vitae and expert report of Allen H. Pachtman M.D. Similarly, defendants filed a motion to strike this late submission; said motion was granted on May 24, 2004. In addition, the supplemental report of Peter Breggin M.D. was belatedly submitted and was also precluded by this court on May 24, 2004.

Lastly, defendants challenged the initial expert report of Breggin. A *Frye* hearing was held on June 4, 2004 to determine the admissibility of evidence proffered by Breggin. The hearing addressed whether prolonged exposure to high doses of benzodiazepines caused permanent brain injury. At that time, Breggin identified the methodologies used to draw the conclusion that such exposure does cause permanent brain injury. Specifically, the eight methodologies he noted were:

"(1) A review of the Diagnostic Manual of the American Psychiatric Association. The manual provides that dementia:

• may be 'specifically related to disorders of the frontal lobe or associated subcortical pathways,'

• may be persisting in that 'the memory disturbance persists long after the individual is no longer experiencing the effects of the substance,'

• may be induced by benzodiazepines, and

• the deficits associated with the disorder 'are usually permanent and may worsen even if the substance use stops, although some cases do show improvement.'[2]

"(2) An examination of one patient diagnosed with permanent brain dysfunction which may or may not have been caused by prolonged exposure to benzodiazepines;[3]

"(3) A review of literature on cognitive deficits caused by benzodiazepines;[4]

---

2. *Frye* hearing transcript pp. 30-31, 59-61 (06/04/04). See also, p. 76 ("Brain atrophy is not discussed in here. Dementia is discussed and dementia is the syndrome that is associated with brain damage and brain atrophy.").

3. *Frye* hearing transcript p. 41.

4. *Frye* hearing transcript pp. 33-34.

"(4) A review of four[5] studies that 'demonstrate scientifically' that benzodiazepines cause enlarged ventricles which Breggin interprets as 'the corresponding phenomenon of atrophy of the brain, the same thing;'[6]

"(5) A review of six studies that conclude benzodiazepines cause permanent cognitive disorders.[7] Breggin, however, could neither recall the names of the studies nor provide the court with a copy of said studies;

"(6) A review of books 'that touch on' the adverse effects of benzodiazepines;[8]

"(7) A review of plaintiff's medical records to exclude other diagnoses;[9] and lastly

"(8) Informal discussions with other physicians during 'CME seminars on subjects like these.' "[10]

Copies of four articles were provided to the court, two of which were authored by Breggin. The Breggin articles discussed short-term effects of benzodiazepine use. The third article discussed varied studies of cognitive effects in long-term users, not the long-term ef-

---

5. One study cited, Schmouse (sp) and Craig, Psychological Medicine 869-873, concluded that benzodiazepines caused enlargement of cerebral fluid spaces. The study however does not conclude that such effects are permanent.

6. *Frye* hearing transcript pp. 45-46, 49.

7. *Frye* hearing transcript pp. 49, lines 4-12

"[W]e have about six studies that look at permanent cognitive disorders from these drugs. And those disorders as described fit the criteria for dementia with frontal lobe damage. I don't know—I'd have to look to see if they specifically say frontal lobe damage. But they described—their experimental studies, they're not conclusions for a court of law."

8. *Frye* hearing transcript pp. 34-35.

9. *Frye* hearing transcript p. 34.

10. *Frye* hearing transcript p. 35.

fects of the drug. There, however, is no indication of an analysis into the issue of permanency after cessation of the benzodiazepines. The article specifically provided that, "results suggest that memory impairments, if they do occur, may be due to the acute effects of the drug and do not support the hypothesis that long-term benzodiazepine use leads to permanent memory impairment." [11] This article, however, is neither a clinical nor controlled study, but is instead an analysis of other studies which do not examine permanent brain damage caused by benzodiazepine use. The fourth article discusses persisting, not permanent, effects of benzodiazepine use.[12] In this study, subjects were tested six months after cessation at which time there was indication of "modest recovery of certain deficits." It is important, however, to note that this is not a longitudinal study to determine the long-term effects of the benzodiazepines.

Breggin stated that his methodologies did not include treatment of patients with permanent frontal lobe brain damage caused by the prolonged use of benzodiazepines or clinical/control studies analyzing the long-term effects of benzodiazepine use.

## PROCEDURAL HISTORY

On June 11, 2004, a second hearing was held before this court to determine if any issue remained for

---

11. Melinda J. Barker et al., "Cognitive Effects of Long-term Benzodiazepine Use, A Meta-Analysis" CNS Drugs 2004 18(1): 37-48.

12. P.R. Tata et al, "Lack of Cognitive Recovery Following Withdrawal from Long-Term Benzodiazepine Use" Psychological Medicine, vol. 24, 203-213 (1994).

trial. On that day, two orders were issued. (1) Defendants' motion to preclude the testimony of Breggin regarding permanent brain injury and permanent cognitive losses due to the use of benzodiazepines was granted. At that time, plaintiffs' counsel informed the court that Breggin would not testify about short-term cognitive deficiencies independent of plaintiff's permanent injuries. Seizing the opportunity, defendants made an oral motion for summary judgment. Defendants rightly reasoned that plaintiffs could no longer make out a prima facie case since their only expert witness declined to testify on the remaining issue. (2) The court granted the defendants' motion and the matter was dismissed.

On June 18, 2004, plaintiffs appealed the order dated June 11, 2004. However, in their Statement of Matters Complained of on Appeal, plaintiffs include three prior orders dismissing plaintiff's expert witnesses as well as two orders denying plaintiffs' motion to strike defendants' experts.

## DISCUSSION

### Summary Judgment

Under the Pennsylvania Rules of Civil Procedure, a motion for summary judgment may be granted: "if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(2).

## 1. Medical Malpractice

To establish a cause of action for medical malpractice in Pennsylvania, the plaintiff must show that: "(1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of the duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and, (4) the damages suffered by the patient were a direct result of that harm. . . . Moreover, the patient must offer an expert witness who will testify to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable . . . standards, and that such deviation was the proximate cause of the harm suffered." *Eaddy v. Hamaty,* 694 A.2d 639, 642 (Pa. Super. 1997). (citations omitted) Plaintiff failed to establish the requisite elements.

There is no dispute as to the need for expert testimony in this matter. See *Toogood v. Owen J. Rogal D.D.S. P.C.,* 573 Pa. 245, 255, 824 A.2d 1140, 1145 (2003) ("The expert testimony requirement in a medical malpractice action means that a plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence, causation is also a matter generally requiring expert testimony."). Plaintiff's sole expert was precluded from testifying about plaintiff's permanent injuries. As a result of the court's order, plaintiff's expert elected not to testify with respect to the short-term effects of benzodiazepines. See transcripts 06/11/04, pp. 11-12.

"[I]t was Dr. Breggin's position that he would not be able to testify in this case as to the short-term if your honor is precluding him from testifying as to the long-term, because they are intertwined inextricably to the point that he under oath could not offer honest, credible testimony, and therefore he would not, I don't think, be willing to offer part of his opinion without the entire opinion."

Without Breggin's testimony, plaintiff could not make out a case for medical malpractice.

## Frye *Standard*

This court precluded Breggin from testifying that the permanent injuries allegedly suffered by the plaintiff were a result of prolonged exposure to benzodiazepines in dosage amounts approved by the guidelines established by the Food and Drug Administration. There is no dispute that the conclusions of Breggin are novel. However it is the methodology, not the conclusion, of concern to the court. *Trach v. Fellin,* 817 A.2d 1102 (Pa. Super. 2003).

### A. *Methodology*

It is important to understand two fundamental terms as defined by the Superior Court. The first term, methodology, is "[1] a method of research in which a problem is identified, [2] relevant data are gathered, [3] a hypothesis is formulated from these data, and [4] the hypothesis is empirically tested." *Trach,* 817 A.2d at 1113. "Empirical" is defined as "provable or verifiable by experience or experiment." *Id.* (citations omitted) A vital characteristic of the scientific method, as the Supe-

rior Court determined, consists of the "ability to test or verify a scientific experiment by a parallel experiment or other standard of comparison (control) and to replicate the experiment to expose or reduce error." [13] *Id.*

The Superior Court of Pennsylvania has found extrapolation as one of three methodologies commonly accepted within the scientific community. Generally, extrapolation is tolerable under limited circumstances. See *Trach supra.* Presumably, this is the method which the plaintiffs ask this court to accept as the basis for their expert's conclusion as Breggin readily admits that he has conducted neither clinical trials nor clinical studies.

First, the court is not persuaded that Breggin's approach is the type of extrapolation described and accepted by the Superior Court in lieu of clinical trials and studies. The "methods" described appear to be nothing more than a few anecdotal references and a cursory review of several studies tangentially related to benzodiazepines and possible permanent effects.

Second, the circumstances that would warrant the use of extrapolation are not present in this case. Extrapolation is a method to be used in limited circumstances.

---

13. "One of the primary reasons we embraced the *Frye* test . . . was its assurance that judges would be guided by scientists when assessing the reliability of a scientific method. . . . Given the ever-increasing complexity of scientific advances, this assurance is at least as compelling today as it was in 1977, when we decided that case. We believe now, as we did then, that requiring judges to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof, as the *Frye* rule requires, is the better way of insuring that only reliable expert scientific evidence is admitted at trial." *Grady v. Frito-Lay Inc.,* 576 Pa. 546, 557, 839 A.2d 1038, 1045 (2003). (citations omitted)

"Specifically, extrapolation is utilized in the scientific community when the medical inquiry is new or the opportunities to examine a specific cause and effect relationship are limited." *Donaldson v. Central Illinois Public Svc. Co.,* 199 Ill.2d 63, 84-85, 262 Ill. Dec. 854, 767 N.E.2d 314 (2002). Neither party posits that the medical inquiry into the effects of benzodiazepines is new. Thus, the only other option under which extrapolation would find acceptance is when the opportunity to examine a specific cause and effect relationship is limited due to the danger of a clinical trial or study.

The facts in *Trach* are distinguishable from the facts of this case. In *Trach* and the line of cases that follow, the plaintiffs were either poisoned by (1) consumption of medication in an amount six times in excess of the recommended dosage or (2) exposure to a known toxic substance. Because the likelihood of the circumstances being repeated was so remote, extrapolation was the only ethical means by which to identify a causal relationship. For extrapolation to apply to this case the circumstances must not be easily subject to replication and the substance must be toxic by nature or a result of an overdose.

There is no evidence or allegation that the medication prescribed is poisonous.[14] Benzodiazepines have been used in the treatment of psychiatric disorders since being introduced in the 1960s. Consequently, it does not appear statistically that there exists an insignificant num-

---

14. If the court misinterprets plaintiffs' expert and Breggin does contend that the amount prescribed in accordance with the FDA regulations was poisonous, his testimony would be excluded for the same reasons delineated in this opinion.

ber of persons who may participate in studies about the effects of long-term use of the medication. "Epidemiological data from different countries have indicated that between 0.5 percent and 5.8 percent of the adult population use benzodiazepines on a long-term basis of one year or more." Barker, Melinda J. et al., "Cognitive Effects of Long-Term Benzodiazepine Use: A Meta-Analysis" CNS Drugs 2004: 18(1): 37-48. Additionally, there is no allegation by the plaintiff that he consumed amounts of the benzodiazepines in excess of the recommended dosage.

Breggin failed to establish that his variation of an accepted methodology is generally accepted by scientists in the relevant field as a method for arriving at his conclusion. *Grady v. Frito-Lay Inc.,* 576 Pa. 546, 558, 839 A.2d 1038 (2003). Pennsylvania evidentiary rules for the admissibility of novel scientific evidence comport with the *Frye* test. See *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) ("When scientific principle crosses the line from experimental to demonstrable is difficult to define; somewhere in this twilight zone, it becomes admissible when the principle from which deduction made is sufficiently established to have gained general acceptance in the particular field to which it belongs"). Under *Frye,* novel scientific evidence is admissible only upon a showing that the methodology has gained general acceptance in the relevant medical community. See *Grady; Blum v. Merrell Dow Pharmaceuticals,* 564 Pa. 3, 764 A.2d 1 (2000); *Commonwealth v. Blasioli,* 552 Pa. 149, 713 A.2d 1117 (1998); *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977). Breggin's testimony fell well short of the mark.

Based on the above guidelines, this court excluded Breggin's testimony regarding plaintiff's permanent injuries.

The court also finds the Breggin report to be legally insufficient. In the 17-page report, Breggin fails to identify the standard of care for psychiatrists in the treatment of signs and symptoms akin to those presented by Vinitski. Rather, Breggin spends 14 pages critiquing the treatment provided not because it ran counter to the acceptable standards of care but because it ran counter to Breggin's personal ideas and ideologies of what the standards ought to be.

Breggin's report draws legal conclusions rather than providing facts which would allow a fact-finder to come to his own conclusion.[15] A review of the Breggin report does not indicate where and how the doctors deviated from the standard of care or how harm was caused as a result of the care received.[16]

*Previous Orders Dismissing Plaintiffs' Experts*

Plaintiffs allege that the court erred in precluding testimony and reports of the following experts: Charles Nemeroff M.D., Ph.D.; Allen H. Pachtman M.D.; Robert P. Wolf Ed.D., M.B.A.; and supplemental report of Robert Breggin M.D. The court found the Nemeroff re-

---

15. "Dr. Adler's actions during the above visits were extremely negligent and set the stage for the patient's future deterioration." (Breggin report at 4); "Dr. Perkel commits extreme malpractice" (6); "due to negligent prescription practices" (6); "The treatment continues to escalate in negligence" (7); "In a most remarkable act of negligence, . . ." (8); "The failure to begin medication reduction was extreme malpractice" (8); "It was negligent to . . ." (8).

16. *Smail v. Flock,* 407 Pa. 148, 152-53, 180 A.2d 59 (1962) (It is not enough for an expert to say something could have happened or to guess; expert testimony must assert that the result came from the cause alleged).

port to be lacking in that it failed to provide that the injury suffered by the plaintiff was a result of defendants' negligence.

"For a plaintiff to make out his cause of action in such a case, therefore, the law requires that expert medical testimony be employed. In addition to its bearing on whether or not the defendant's conduct was negligent, such testimony is needed to establish that the injury in question did, with a reasonable degree of medical certainty, stem from the negligent act alleged." *Hamil v. Bashline,* 481 Pa. 256, 267, 392 A.2d 1280, 1285 (1978). See also, *Martin v. Evans,* 551 Pa. 496, 502, 711 A.2d 458, 461 (1998) ("and that this deviation proximately caused actual harm.").

The remaining reports were precluded as they were in direct violation of the existing case management order and the court's December 8, 2003 directive that no further submissions, new or modified, would be accepted. Reports submitted prior to that date were accepted assuming they complied with the legal requirements.

## CONCLUSION

For the reasons stated above, this court's orders precluding testimony and/or granting summary judgment and otherwise dismissing this action should be affirmed.